## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Brian VanOosbree, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 231 and 844, to require Facebook to disclose to the government, records and other information in its possession pertaining to the subscriber or customer associated with the user identifications.

2.      I am a Special Agent (SA) of the Federal Bureau of Investigation, currently assigned to the FBI's Bismarck Resident Agency. I have been employed by the FBI since 2011. I am currently assigned to investigate drug trafficking, organized crime, and other criminal matters in western North Dakota. In my experience with the FBI, I have participated in numerous search warrants, arrests, and complex investigations. The information contained within the affidavit is based on my training and experience as well as information obtained from other law enforcement agents involved with this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 231 and 844 have been committed by SOPHIA WILANSKY(WILANSKY). There is also probable cause to search the information described in Attachment A for evidence of these crimes, and contraband or fruits of these crimes, as described in Attachment B.

### Identity of Target Subject

4.      SOPHIA WILANSKY, is a female, DOB XX/XX/1995. Criminal history:

- Arrest date- 06/06/2016, Williston, Vermont, Unlawful Trespass- Land, Misdemeanor, Guilty, Sentenced 4-10 days in jail, suspended with probation; Resisting Arrest #1, Misdemeanor, Guilty, Sentenced 4-10 days in jail, suspended with probation; Disorderly Conduct-Assembly
- Arrest date- 06/29/2016, Boston, Massachusetts, Disturbing the Peace, Resisting Arrest, Trespassing

<u>Probable Cause</u>

5.   In mid-2016, Dakota Access, LCC, a Division of Energy Transfer of Houston, Texas, began construction of a 1,172 mile pipeline between North Dakota and Illinois known as the Dakota Access Pipeline (DAPL). The pipeline route crosses the Missouri River immediately north of the Standing Rock Indian Reservation, North Dakota. In mid-August, a group of anti-pipeline activists led by the Standing Rock Tribal Chairman traveled to the construction site. What began as a peaceful protest turned into a confrontation between activists, law enforcement (LE), and pipeline construction workers. Many activists have been arrested, including the Tribal Chairman, for disorderly conduct, resisting arrest, tampering with pipeline infrastructure, trespassing, threatening law enforcement, and arson. The confrontations at times escalated to a point in which LE and construction workers withdraw out of concern for their safety. Over several months the number of campers continued to grow, and with increased numbers their protest tactics changed from peaceful events to weekly violent threats and property damage.

6.   On November 20, 2016, pipeline protesters gathered on the Backwater Bridge on Highway 1806, Morton County, North Dakota. This site has been the location of many violent confrontations between anti-DAPL protesters and law enforcement. Protesters were attempting to dismantle a barricade set up by police, and were also using the barricade as cover to throw rocks, logs, bottles, and lug nuts toward law enforcement. Law enforcement responded to this activity by utilizing various means of less than lethal force over the course of several hours.

7.   At approximately 4:00 A.M., on November 21, 2016, law enforcement observed movement in or around the area of a disabled vehicle located near the barricade. Information received by law enforcement earlier that day indicated that protesters planned to detonate explosive devices near the barricade. An officer

observed a female subject in the area of the disabled vehicle, and attempts were made to call out those behind the vehicle. One officer observed three people roll silver cylinders towards the area underneath the disabled vehicle.

8. A law enforcement officer observed a female moving toward the rear of the disabled vehicle and engaged her with a less-than-lethal round in the thigh. Law enforcement officers heard what appeared to be an explosion and saw a brief intense flash toward the rear or side of a vehicle, near or beneath the female; however, due to the barricade the officers were unable to the actual explosion. After the explosion, several males ran up to the female and picked her up off the ground. The males then carried her away and yelled for a medic. Later when WILANSKY was admitted to Sanford Hospital in Bismarck, North Dakota, a contusion was noted on one of her thighs.

9. WILANSKY was transported by vehicle from the Backwater bridge area to the parking lot of Prairie Knights Casino on Standing Rock Indian Reservation. At Prairie Knights Casino a 911 call was made by a Steven Martinez requesting an ambulance to that location. Bureau of Indian Affairs (BIA) officers were the first to respond to Prairie Knights Casino and immediately began to administer first aid to WILANSKY. Initial reports by BIA officers were that WILANSKY had a hole in her arm or that it was possibly severed. WILANSKY was then placed in an ambulance from Standing Rock Ambulance Service and driven to the emergency room at Sanford Hospital in Bismarck North Dakota.

10. WILANSKY was admitted to Sanford Hospital and treated for a severe blast wound. WILANSKY told the emergency room doctor treating her that she was injured by a "concussion grenade." WILANSKY also put her occupation as, "activist" on her hospital admittance form. WILANSKY was then discharged from Sanford Hospital and transported by Sanford AirMed to Hennepin County Medical Hospital (HCMC) in Minneapolis, Minnesota.

11. A post incident investigation initiated by the North Dakota Bureau of Criminal Investigation indicates that law enforcement present on the Backwater Bridge during the event leading to the injury of WILANSKY did not have in their possession,

3

maintain, or deploy any devices identified as "concussion grenades." Law enforcement deployed numerous non-lethal devices throughout the events of the evening of November 20 and early morning hours of November 21, 2016, but none of those devices were determined capable of creating the sound and intense light of the explosion observed by the officers located near the barricade on the bridge.

12. At HCMC, WILANSKY received a surgery where a piece of metal shrapnel was removed from her forearm. WILANSKY was then placed in the Intensive Care Unit (ICU) to recover.

13. Upon hearing of a possible explosion in the Bismarck area, and a person involved in the explosion being transported to Minneapolis, Agents from the local office of the Bureau of Alcohol, Tobacco, Firearms, and Explosives attempted to interview WILANSKY in her ICU room. These Agents were met by WAYNE WILANSKY (WAYNE), WILANSKY's father, upon arriving at her ICU room. WAYNE turned those Agents away citing that WILANSKY needed to rest and that she now had legal representation.

14. Agents from the FBI's office in Minneapolis, Minnesota then arrived at WILANSKY's ICU room to secure the premises and preserve any possible evidence that may be contained in it.

15. After initial attempts by WAYNE to refute Agents and not allow them into WILANSKY's ICU room, WAYNE then acquiesced. Agents informed WAYNE they were obtaining a search warrant for WILANSKY's ICU room and her possessions. Agents asked WAYNE where WILANSKY's phone and clothes were. WAYNE initially told Agents he had no idea where those items were. WAYNE then told Agents he could bring some of WILANSKY's clothes to them, and a warrant would not be necessary. Agents also asked WAYNE about the whereabouts of WILANSKY's phone, and WAYNE said he did not know and that he did not want to speak about the topic any more.

16. WAYNE then went to his hotel room and returned with a white plastic bag containing the following items of WILANSKY's property: a black on one side and

silver on the other piece of cloth, a small piece of black cloth, a portion of a green jacket, and a cell phone cover.

17. Agents also told two individuals, whom refused to identify themselves, in the room visiting WILANSKY that they were free to leave but the bags in their possession would need to be inspected for possible evidence. The two individuals refused to leave, or to let Agents inspect their bags until a search warrant was obtained. These individuals were told they were not under arrest and that they could leave at any time, and if Agents were able to inspect their bags and there was no evidence inside they could take their bags as well. These individuals were later released with their property.

18. Photos of WILANSKY were later posted to social media accounts, showing a severe arm injury. The social media accounts attribute the injury to law enforcement actions.

19. An open source check for SOPHIA WILANSKY performed on November 21, 2016, on Facebook showed an account numbered 100010223346052.

20. On November 21, 2016, a Preservation Request was given to Facebook for the above referenced account number.

21. Upon checking for this Facebook account again on November 22, 2016, it was noted that the account had been deleted and was no longer available to be viewed. The Preservation Request will have preserved that evidence, and the evidence can be located by Facebook, Inc.

22. Additionally, I have probable cause to believe that the accounts that are the subject of the instant application will have stored information and communications that are relevant to this investigation, to include evidence of the identity and/or location of the persons maintaining and controlling the above social networking accounts, and ultimately the identity and/or location of the persons engaging in the crimes described herein. As outlined below, and based on Affiant's training and experience, there is

5

probable cause to believe that evidence, fruits and/or instrumentalities of the aforementioned crimes are located in these accounts.

## BACKGROUND CONCERNING FACEBOOK

11. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and with the general public.

12. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

13. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends" such as profile changes, upcoming events, and birthdays.

14. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

6

15. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

16. Facebook allows users to upload photos and videos. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

17. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

18. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

7

19. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

20. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

21. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

22. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

23. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

24. Facebook also has a Marketplace feature which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

25. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

26. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from

the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

27.  Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

28.  Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

29.  Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## CONCLUSION

30.  Your Affiant anticipates executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications)

particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

31. Based on the forgoing, your Affiant requests that the Court issue the proposed search warrant.

32. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Brian VanOosbree, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 28th day of March, 2017.

CHARLES S. MILLER JR.
United States Magistrate Judge